Tina Wolfson (SBN 174806)
*twolfson@ahdootwolfson.com*
Theodore W. Maya (SBN 223242)
*tmaya@ahdootwolfson.com*
Alyssa Brown (SBN 301313)
*abrown@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile:  (310) 474-4521

Jonathan S. Mann (*pro hac vice* forthcoming)
**PITTMAN, DUTTON, HELLUMS,
BRADLEY & MANN, P.C.**
2001 Park Place North, Suite 1100
Birmingham, AL 35203
Tel: (205) 322-8880
Fax: (205) 328-2711
E: jonm@pittmandutton.com

*Attorneys for Plaintiff and the Putative Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| ETHAN HECK, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>v.<br><br>CALIFORNIA PHYSICIANS' SERVICE D/B/A BLUE SHIELD OF CALIFORNIA,<br><br>                    Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

**CLASS ACTION COMPLAINT**

**INTRODUCTION**

1. Plaintiff, Ethan Heck ("Plaintiff") brings this class action against Defendant California Physicians' Service d/b/a Blue Shield of California ("Defendant" or "Blue Shield") for its failure to secure and safeguard the sensitive information that it collected and maintains as part of its regular business practices, including, but not limited to personally identifying information such as patient name; city; zip code; gender; and family size; ("PII") and protected health information, such as insurance plan name, type and group number; Blue Shield assigned identifiers; medical claim services date, service provider, and patient financial responsibility; and "Find a Doctor" search criteria and results ("PHI" and, together with PII, "Personal Information").

2. Blue Shield has engaged in an offensive, illegal, and widespread practice of disclosing its patients' Personal Information to unauthorized third parties, including Google LLC ("Google").

3. Blue Shield owns and operates certain internet-based and/or accessible properties, including, but not limited to, www.blueshieldca.com and related webpages (the "Website") and a Blue Shield mobile app (the "App") (collectively, "Web Properties").

4. Blue Shield historically has used the third-party vendor service, Google Analytics, to track website usage of members who entered Blue Shield's Web Properties, along with other Google tracking tools such as Google Tag Manager (collectively, the "Tracking Tools").

5. Blue Shield, on February 11, 2025, discovered that, between April 2021 and January 2024, the Tracking Tools it uses on its Web Properties were configured in a way that allowed certain member data to be shared with Google's advertising product, Google Ads, including patients' Personal Information.

6. The data disclosed by the Tracking Tools allowed unauthorized third parties, including Google, to receive and view patients' Personal Information and intercept their private digital communications, mine them for purposes unrelated to the provision of healthcare, and then directly monetize that data to deliver targeted advertisements.

7. Blue Shield provided its Web Properties to patients, including Plaintiff and Class Members, to allow for accessing information about doctors, specialists, and hospitals within Blue Shield's networks; facilitating telehealth appointments; and providing resources for mental health care.

**CLASS ACTION COMPLAINT**

Users of Blue Shield's Web Properties could also use the Web Properties to file insurance claims, pay bills online, access plan information, and locate service providers.

8. By providing these functions via its Web Properties, Blue Shield knew, or should have known, that its patients would use the Web Properties to communicate Personal Information to Blue Shield in conjunction with obtaining medical services and submitting insurance claims.

9. Unbeknownst to Plaintiff and Class Members, however, the Tracking Tools embedded in Blue Shield's Web Properties contained source code that surreptitiously tracked, recorded, and disseminated Plaintiff's and Class Members' online activity and communications (including Personal Information) to Google without first obtaining Plaintiff's and Class Members' consent, in violation of HIPAA, state laws, industry standards, and patient expectations.

10. By installing and using the Tracking Tools on its Web Properties, and configuring the Tracking Tools in a way that allowed Personal Information to be shared with Google, Blue Shield effectively planted a bug on Plaintiff's and Class Members' web browsers and devices, which caused their communications to be intercepted, accessed, viewed, and captured by third parties in real time, as they were communicated by Plaintiff and Class Members.

11. As a result of Blue Shield's conduct, Plaintiff's and Class Members' Personal Information, including their PHI, has been disclosed to an unauthorized third party without Plaintiffs' and Class Members' knowledge or permission.

12. Consequently, Plaintiff brings this action for legal and equitable remedies to address and rectify the illegal conduct and actions described herein, to enjoin Blue Shield from making similar disclosures of its patients' Personal Information in the future, and to require Blue Shield to fully articulate, *inter alia*, the specific Personal Information disclosed to third parties and to identify all the recipients of that information.

13. As a result of Blue Shield's conduct, Plaintiff and Class Members have suffered numerous injuries, including invasion of privacy, loss of benefit of the bargain, diminution of value of the Personal Information, statutory damages, and the continued and ongoing risk to their Personal Information.

**CLASS ACTION COMPLAINT**

14.     Plaintiff seeks to remedy these harms and bring causes of action for (1) negligence/negligence per se; (2) invasion of privacy; (3) breach of implied contract; (4) unjust enrichment; (5) declaratory/injunctive relief; (6) violations of the California Medical Information Act ("CMIA"); (7) violations of the California Consumer Privacy Act ("CCPA"); (8) violations of the California Invasion of Privacy Act ("CIPA"); and (9) violations of the California Constitution.

## PARTIES

15.     Plaintiff was a resident of Contra Costa County in California and was a Blue Shield member from January 2019 through December 2023. Currently, Plaintiff resides in Clark County, Nevada.

16.     Defendant California Physicians' Service d/b/a/ Blue Shield of California is a mutual benefit corporation and health plan, headquartered in Oakland, California.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a), because Plaintiff and Defendant are citizens of different states.

18.     The Court has personal jurisdiction over Defendant because Defendant is headquartered in Oakland, California, operates in California, conducts other significant business in California, and otherwise has sufficient minimum contacts with and intentionally avails itself of the markets in California.

19.     Venue properly lies in this judicial district because, *inter alia,* Defendant has a principal place of business in this district; Defendant transacts substantial business, has agents, and is otherwise located in this district; and a substantial part of the conduct giving rise to Plaintiff's claims occurred in this judicial district.

## DIVISIONAL ASSIGNMENT

20.     Pursuant to L.R. 3-2(c), assignment to this division is proper because a substantial part of the conduct which gives rise to Plaintiff's claims occurred in this district.

/ / /

/ / /

/ / /

**CLASS ACTION COMPLAINT**

## FACTUAL ALLEGATIONS

### Blue Shield Collects and Stores Personal Information

21.     Blue Shield is one of the largest health care insurers in California. It partners with physicians and practice groups to provide medical coverage, including Health Management Organizations ("HMOs"), Preferred Provider Organizations ("PPOs"), dental care, and vision care. As of December 2023, Blue Shield had 4.8 million members, 7,119 employees, $25 billion in revenue.[1]

22.     Blue Shield routinely collects sensitive Personal Information in order to provide products and services to its members. On its website, Blue Shield has an Online and Mobile Privacy Notice ("Privacy Notice"), which states, in part: "[t]he collected information will be used to facilitate the provision of our services to you or your organization and with your consent, to provide you with relevant communications."[2]

23.     The Privacy Notice additionally states, "[a]ny personal information you provide on our website or App will be used only in ways consistent with this, the HIPAA and the GLBA Privacy Notices, and in accordance with applicable laws and regulations."[3]

24.     In addition to its Privacy Notice, Blue Shield also has a HIPAA Notice of Privacy Practices ("HIPAA Notice"). In the HIPAA Notice, Blue Shield acknowledges:

> We are required by federal and state law to provide you with this notice of our legal duties and privacy practices as they relate to your PHI. We are required to maintain the privacy of your PHI and to notify you in the event that you are affected by a breach of unsecured PHI. When we use or give out ("disclose") your PHI, we are bound by the terms of this notice, which applies to all records that we create, obtain, and/or maintain that contain your PHI.[4]

---

[1] *2023 Mission Report*, Blue Shield of California, https://www.blueshieldca.com/content/dam/bsca/en/member/docs/Blue-Shield-of-California-2023-Mission-Report.pdf (last accessed Apr. 10, 2025).
[2] *Online and Mobile Privacy Notice*, Blue Shield of California, https://www.blueshieldca.com/en/home/about-blue-shield/privacy-and-security/online-mobile-privacy-notice (last accessed Apr. 10, 2025).
[3] *Id.*
[4] *HIPAA Notice of Privacy Practices*, Blue Shield of California and Blue Shield of California Life & Health Insurance Company, (Aug. 16, 2013), (footnote continued)

**CLASS ACTION COMPLAINT**

25.     The HIPAA Notice includes specifically delineated uses for PHI, and states that "[o]ther than for the purposes described above, we must obtain your written authorization to use or disclose your PHI."[5]  Neither tracking nor analytics is a specified purpose delineated in the HIPAA Notice.

26.     Defendant is and was aware of the sensitive nature of the Personal Information it collects, and it acknowledges the importance of data privacy. Defendant made promises and representations to Plaintiff and Class Members that the Personal Information collected as part of Defendant's operations would be kept safe, confidential, and that the privacy of that information would be maintained.

27.     Plaintiff and Class Members provided their Personal Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

28.     Specifically, Plaintiff and other Class Members who used Blue Shield's Web Properties reasonably believed they were communicating only with their trusted healthcare and insurance providers, and nothing about the Web Properties' appearance indicated that unauthorized third parties such as Google would intercept and obtain Personal Information submitted by patients.

29.     However, Blue Shield surreptitiously utilized Google Analytics and intentionally installed it, along with other Tracking Tools, on its Web Properties.

30.     While Google Analytics allows Blue Shield to optimize the delivery of ads, measure cross-device conversions, create custom audiences (for future targeting marketing and advertising), and decrease its advertising and marketing costs, Blue Shield's Web Properties do not require Google Analytics or any other Tracking Tools to function. Instead, Blue Shield used Google Analytics to barter patients' data in exchange for the "free" advertising services offered by Google.

31.     Plaintiff and Class Members never consented, agreed, authorized, or otherwise permitted Blue Sheild to disclose their Personal Information to Google, nor did they intend for Google to be a party to their communications (many of them highly sensitive and confidential) with Blue Shield.

**Blue Shield Admits It Disclosed Plaintiff's and Class Members' Personal Information to Third**

---

https://www.blueshieldca.com/content/dam/bsca/en/member/docs/2024/C18305-0923-REF1520344-SECURE.pdf.
[5] *Id*.

**CLASS ACTION COMPLAINT**

**Parties**

32.     On April 9, 2025, Blue Shield issued a Notice of Data Breach ("Notice") to insurance plan participants, via email and posted on its website, which stated, in part, the following:[6]

> Blue Shield of California has begun notifying certain members of a potential data breach that may have included elements of their protected health information. […]
> **What happened**
>
> Like other health plans, Blue Shield historically used the third-party vendor service, Google Analytics, to internally track website usage of members who entered certain Blue Shield sites. We were doing this to improve the services we provide to our members.
>
> On February 11, 2025, Blue Shield discovered that, between April 2021 and January 2024, Google Analytics was configured in a way that allowed certain member data to be shared with Google's advertising product, Google Ads, that likely included protected health information. Google may have used this data to conduct focused ad campaigns back to those individual members. We want to reassure our members that no bad actor was involved, and, to our knowledge, Google has not used the information for any purpose other than these ads or shared the protected information with anyone.
>
> Blue Shield severed the connection between Google Analytics and Google Ads on its websites in January 2024. We have no reason to believe that any member data has been shared from Blue Shield's websites with Google after the connection was severed. Upon discovering the issue, Blue Shield immediately initiated a review of its websites and security protocols to ensure that no other analytics tracking software is impermissibly sharing members' protected health information.
>
> **What information was involved**
>
> The information that may have been impacted includes the following:
> Insurance plan name, type and group number; city; zip code; gender; family size; Blue Shield assigned identifiers for members' online accounts; medical claim service date and service provider, patient name, and patient financial responsibility; and "Find a Doctor" search criteria and results (location, plan name and type, provider name and type).

33.     Although Blue Shield characterized the above as a "data breach," no hacker or bad actor obtained unauthorized access to Blue Shield's Web Properties. Instead, Blue Shield voluntarily shared

---

[6] *Notice of Data Breach*, BLUE SHIELD, (Apr. 9, 2025), https://news.blueshieldca.com/notice-of-data-breach.

**CLASS ACTION COMPLAINT**

1  Plaintiff's and Class Members' Personal Information with third parties, such as Google. As such, the

2  above notice more aptly describes a data disclosure (henceforth, the "Data Disclosure").

3      34.    As stated in the Notice, the Data Disclosure "likely included protected health

4  information."

5      35.    On information and belief, Google used the Personal Information Blue Shield disclosed

6  to it to conduct focused ad campaigns on Plaintiffs and Class Members.

7      36.    Further, although Blue Shield claims it did not discover the Data Disclosure until

8  February of 2025, it also claims that it "severed the connection between Google Analytics and Google

9  Ads on its websites as of January 2024." It does not provide a reason for the "severance," or for the

10 year-long delay in notifying its members.

## Blue Shield Uses Google's Tracking Tools on its Web Properties

12     37.    As alleged throughout, Blue Shield utilizes various Tracking Tools provided by Google,

13 including, but not limited to, Google Analytics on its Web Properties.

14     38.    Google Analytics tracks what a user communicates to Blue Shield's website.[7]

15     39.    Google Analytics receives transmissions from webpages that contain and/or utilize

16 Tracking Tools.[8] Thus, Plaintiff's and Class Members' Personal Information would not have been

17 disclosed to Google but for Blue Shield's decision to install the Tracking Tools on its Web Properties.

18     40.    Blue Shield employed Tracking Tools, including Google Analytics, to intercept,

19 duplicate, re-direct, and disclose Plaintiff's and Class Members' Personal Information to Google.

20     41.    Blue Shield's source code manipulated Plaintiff's and Class Members' browsers by

21 secretly instructing the browser to duplicate the individuals' communications (HTTP requests) with

22 _____

23 [7] *Comparing Google Analytics vs Facebook Pixel*, Boltic, https://www.boltic.io/blog/google-analytics-vs-facebook-

24 pixel#:~:text=Google%20Analytics%20is%20a%20comprehensive,time%20on%20site%2C%20and%20conversions.&text=On%20the%20other%20hand%2C%20Facebook,user%20actions%20on%20yo

25 ur%20website. (last visited Apr. 10, 2025)

26 [8] Defendant's Google Analytics tool stores a client ID in a first-party cookie named _ga (also identified as a cid) to distinguish unique users and their sessions on Defendant's website. Analytics

27 doesn't store the client ID when analytics storage is disabled through Consent Mode. https://support.google.com/analytics/answer/11593727?hl=en#:~:text=Google%20Analytics%20

28 stores%20a%20client,is%20disabled%20through%20Consent%20Mode. (last visited Apr. 10, 2025).

**CLASS ACTION COMPLAINT**

Blue Shield and send those communications to Google. These transmissions occurred contemporaneously, invisibly, and without Plaintiff's and Class Members' knowledge.

42.    Blue Shield has essentially used its source code to commandeer and "bug" or "tap" its Plaintiff's and Class Members' computing devices, effectively allowing Google and other third parties to "listen in" on all of these communications with Defendant.

43.    For example, Blue Shield used Google Analytics and related tools that communicate with Google Ad Services and DoubleClick to track users' actions and communications on the Web Properties. Operating as configured and implemented by Blue Shield, the Tracking Tools, including Google Analytics, caused Plaintiff's and Class Members' Personal Information to be unlawfully intercepted and surreptitiously disclosed to Google.

44.    When Plaintiff and Class Members engaged in activities available through Blue Shield's Web Properties, such as searching for a medical provider, they communicated their Personal Information to Blue Shield.

45.    By designing its Web Properties in the manner described herein, Blue Shield knew or should have known that its patients, including Plaintiff and Class Members, would use its Web Properties to communicate Personal Information in conjunction with obtaining and receiving medical-related services and insurance from Blue Shield.

46.    Plaintiff and Class Member were not aware that their Personal Information would be shared with third parties as it was communicated to Blue Shield, nor did Blue Shield disclose this fact.

47.    Plaintiff and Class Members never consented, agreed, authorized, or otherwise permitted Blue Shield to disclose their Personal Information to third parties, nor did they intend for anyone other than Blue Shield to have access to communications containing their Personal Information.

48.    Blue Shield's Tracking Tools sent non-public Personal Information to third parties, such as Google. This Personal Information included things like Plaintiff's and Class Members' (1) status as medical patients; (2) health conditions; (3) desired medical treatment or therapies; (4) desired locations or facilities where treatment was sought; (5) phrases and search queries (such as searches for symptoms, treatment options, or types of providers); (6) searched and selected physicians and their specialties

**CLASS ACTION COMPLAINT**

conducted via the general search bar; and (7) other information related to their healthcare treatment and conditions.

49.     Importantly, the Personal Information Blue Shield's Tracking Tools sent to third parties included PII that allowed those third parties to connect the Personal Information to a specific patient. Information sent to Google was sent alongside the Plaintiff's and Class Members' unique identifier ("_ga" or "CID"), thereby allowing individual patients' communications with Blue Shield, and the Personal Information contained in those communications, to be linked to their unique Google accounts and therefore their identity.[9]

**Blue Shield Disclosed Plaintiff's and Class Members' Personal Information to Third Parties**

50.     Blue Shield's Web Properties are accessible on mobile devices and personal computers and allow patients to communicate with Blue Shield regarding their past, present, and future health care. These communications include those regarding patients' past, present, and future medical bills, insurance coverage, and payments.

51.     Blue Shield encouraged patients to use the Web Properties to communicate their Personal Information, acquire insurance, identify in-network healthcare providers based on the specific treatment or services they are interested in via the "Find a Doctor" search bar, access information about their insurance coverage, submit claims, pay bills, view records, and more.

52.     Blue Shield purposely installed Tracking Tools on its Web Properties and configured them to surreptitiously share its patients' private and protected communications, including Plaintiff's and Class Members' Personal Information, with third parties such as Google.

53.     The Tracking Tools intercepted, recorded, and disseminated patients' information as they navigated and communicated with Blue Shield via the Web Properties, simultaneously and

---

[9] *See Brown v. Google, Inc.*, *Brown v. Google LLC*, 525 F. Supp. 3d 1049 (N.D. Cal. 2021) (citing internal evidence from Google employees). Google also connects user data to IP addresses; IP addresses have been classified by the United States Department of Health and Human Services ("HHS") as personally identifying information. *See Use of Online Tracking Tools by HIPAA Covered Entities and Business Associates*, U.S. Dept of Health and Hum. Servs. (Dec. 1, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

**CLASS ACTION COMPLAINT**

invisibly transmitting the substance of those communications to unintended and undisclosed third parties.

54.     The information the Tracking Tools allowed to be sent and received by third parties constitutes Personal Information and includes the following:

        a.   Insurance plan name, type and group number;

        b.   City and zip code;

        c.   Gender and family size;

        d.   Blue Shield assigned identifiers for members' online accounts;

        e.   medical claim service date and service provider, patient name, and patient financial responsibility; and

        f.   "Find a Doctor" search criteria and results (location, plan name and type, provider name and type).

55.     The information collected and disclosed by Blue Shield's Tracking Tools is not anonymous and is viewed and categorized by the intercepting party on receipt.

56.     The Personal Information intercepted by and disclosed to Google includes identifying information that allows those third parties to know exactly whose information they have acquired.

57.     For example, Google "stores users' logged-in identifier on non-Google website in its logs. Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-private browsing mode, the same identifier is associated with the data Google collects from the user's browsing activities on that website. Google further logs all such data (private and non-private) within the same logs and uses these data for serving personalized ads."[10]

58.     Simply put, the health information that was disclosed via the Tracking Tools is personally identifiable and was sent alongside other persistent identifiers such as the patients' IP address, Google account ID, and device identifiers.[11]

---

[10] *See Brown v. Google LLC*, Case No. 4:20-cv-3664-YGR, 2023 WL 5029899 (N.D. Cal. Aug. 7, 2023) (order denying summary judgment and citing internal evidence from Google employees).
[11] *Id.*

**CLASS ACTION COMPLAINT**

59.    Blue Shield's Tracking Tools, including the Google Analytics tool, sent non-public Personal Information to Google, including but not limited to information about Plaintiff's and Class Members' past, present, or future health or health care and payment for past, present, or future health care.

60.    Importantly, the Personal Information Google received was sent alongside Plaintiff's and Class Members' IP address, Google Client identifier (cid), and other persistent device identifiers.

61.    As stated above, a Google Client ID (cid), as stored in the _ga cookie, is a unique identifier for a browser-device pair. It is used by Google Analytics to track user interactions across sessions on a specific website.

62.    Google Analytics uses both first- and third-party cookies, and both were used on the Web Properties.[12] Notably, it is nearly impossible for website users to block first-party cookies such as the _ga cookie. Doing so requires specialized knowledge and tools, and often results in the website not functioning properly.

63.    Stated differently, even individuals who take extra steps to safeguard their privacy by using ad blockers and blocking third-party cookies cannot prevent Blue Shield's dissemination of their information to Google.

64.    On information and belief, Blue Shield used Google Analytics alongside Google Tag Manager, and related tools that communicate with Google Ad Services and DoubleClick, all of which were installed on Blue Shield's Web Properties.

65.    On information and belief, though Blue Shield claims to have severed the connection between Google Analytics and Google Ads on their Web Properties in January 2024, Blue Shield is still running certain Google Tracking Tools, such as Google Tag Manager.

66.    Google Tag Manager is a free tracking tool and management platform that allows users, such as Blue Shield, to add marketing tags, or snippets of code, to a website to track and collect

---

[12] A first-party cookie is "created by the website the user is visiting"—in this case, Defendant's Website. A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—i.e., Google. The _ga cookie is always transmitted as a first-party cookie. At a minimum, Google uses the _ga and cookies to link website visitors' data to their to Facebook IDs and corresponding accounts.

**CLASS ACTION COMPLAINT**

marketing data. It allows these users to implement GTM tags without modifying the code while improving the amount and type of information gathered.[13] Users can use Tag Manager to manage tags (such as measurement and marketing optimization JavaScript tags) on their website. Without editing the site code, companies can use Tag Manager to add and update Google Ads, Google Analytics, Floodlight, and third-party tags.[14]

67.    Tags are small pieces of code that track user activity, send data to analytics platforms, or trigger specific actions on a website.

68.    While Google Analytics is the hub for analyzing website data, Google Tag Manager is the tool for transmitting the data points. GTM essentially controls what information is sent to Google Analytics in order to be analyzed. GTM is the platform for deploying and storing the tags without the capacity to examine analyzed reports, which is why the data is sent to Google Analytics. Together, Google Tag Manager and Google Analytics track and create important analytics.[15]

69.    By using GTM, a company can track PDF downloads, scrolling behavior, link clicks, form submissions, video activity, and more.[16]

70.    Google views, uses, and monetizes the data it receives, including from GTM, for marketing, and links Personal Information to other information in its possession.

71.    Blue Shield did not disclose to Plaintiff or Class Members that the Tracking Tools embedded in its Web Properties, such as GTM, intercept, transmit, record, and disseminate Plaintiff's and Class Members' Personal Information to Google (or additional third parties who use Google's marketing services and/or scrape its Real Time Bidding systems to harvest sensitive Personal Information).

---

[13] *What Does Google Tag Manager Do? The Benefits of Google Tag Manager and What to Track* EVOLVE SYSTEMS, https://evolve-systems.com/blog/what-does-google-tag-manager-do-the-benefits-of-google-tag-manager-and-what-to-track/#:~:text=Google%20Tag%20Manager%20(GTM)%20is%20a%20free,website%20to%20track%20and%20collect%20marketing%20data. (last visited Apr. 10, 2025)
[14] *About Google Tag Manager*, GOOGLE, https://developers.google.com/tag-platform/tag-manager (last visited Apr. 10, 2025)
[15] *What Does Google Tag Manager Do, supra*, at fn.13.
[16] *Id.*

**CLASS ACTION COMPLAINT**

72.    Moreover, Blue Shield never received consent or written authorization to disclose Plaintiff's and Class Members' Personal Information in this manner.

**Plaintiff's and Class Members' Personal Information was Viewed and Used by Unauthorized Third Parties**

73.    Unsurprisingly, the Tracking Tools described above are not offered for free to companies like Blue Shield solely for those companies' benefit. "Data is the new oil of the digital economy,"[17] and Google's online advertising business generated 42.4% of global digital ad revenues in 2023.[18]

74.    Thus, the large volumes of personal and sensitive health-related data Blue Shield divulged was actively viewed, examined, analyzed, curated, and used by Google.

75.    The price that Blue Shield paid for the Tracking Tools was the data it allowed Google to intercept from Plaintiff's and Class Members' devices, and the data that it disseminated directly from Blue Shield's own servers.

76.    Even if Google eventually deletes or anonymizes sensitive information that it receives, it must first view that information to identify it as containing sensitive information suitable for removal. Accordingly, there is a breach of confidentiality the instant the information is disclosed or received without authorization. As described by an HHS Bulletin issued in December 2022 (the "HHS Bulletin"):

> It is insufficient for a tracking technology vendor to agree to remove PHI from the information it receives or de-identify the PHI before the vendor saves the information. Any disclosure of PHI to the vendor without individuals' authorizations requires the vendor to have a signed BAA in place **and** requires that there is an applicable Privacy Rule permission for disclosure.[19]

(emphasis in original).

---

[17] Nisha Talagala, *Data as The New Oil Is Not Enough: Four Principles For Avoiding Data Fires*, FORBES, (Mar. 2, 2022), https://www.forbes.com/sites/nishatalagala/2022/03/02/data-as-the-new-oil-is-not-enough-four-principles-for-avoiding-data-fires/.

[18] Melissa Otto, *Global Digital Advertising Revenues – A Look at the Big Three: Alphabet (GOOGL), Meta Platforms (META), Amazon.com (AMZ)*, VISIBLE ALPHOA, (May 17, 2023), https://visiblealpha.com/blog/global-digital-advertising-revenues-a-look-at-the-big-three-alphabet-googl-meta-platforms-meta-amazon-com-amzn/ (last visited Apr. 10, 2025).

[19] *Use of Online Tracking Tools by HIPAA Covered Entities and Business Associates*, U.S. DEPT. HEALTH AND HUMAN SERVICS, (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last accessed Apr. 10, 2025).

**CLASS ACTION COMPLAINT**

**Blue Shield Violated HIPAA and Industry Standards**

77.     The HHS bulletin issued in December 2022 warned regulated entities like Blue Shield about the risks presented by the use of Tracking Tools on their websites.

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[20]

78.     In other words, HHS has expressly stated that entities who implement Tracking Tools that disclose PHI, such as Blue Shield, have violated HIPAA Rules unless they have obtained a HIPAA-complaint authorization from their patients.

79.     In response to the use of Tracking Tools by HIPAA covered entities, like Blue Shield, the HHS Bulletin warns that:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.[21]

80.     The HHS Bulletin further warns that:

> While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.***[22]

81.     In addition, HHS and the FTC have recently issued a letter, once again admonishing entities like Blue Shield to stop using Tracking Tools:

---

[20] *Id*. (emphasis added).

[21] *Id*.

[22] *Id*. (emphasis added).

**CLASS ACTION COMPLAINT**

If you are a covered entity or business associate ("regulated entities") under HIPAA, you must comply with the HIPAA Privacy, Security, and Breach Notification Rules (HIPAA Rules), with regard to protected health information (PHI) that is transmitted or maintained in electronic or any other form or medium. ***The HIPAA Rules apply when the information that a regulated entity collects through tracking technologies or discloses to third parties (e.g., tracking technology vendors) includes PHI. . .*** Even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule. . . As recent FTC enforcement actions demonstrate, it is essential to monitor data flows of health information to third parties via technologies you have integrated into your website or app. The disclosure of such information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule.[23]

82.    Under Federal Law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[24]

83.    The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[25]

84.    The Privacy Rule broadly defines "protected health information" as individually identifiable health information that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

85.    Individually identifiable health information is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past,

---

[23] *Re: Use of Online Tracking Tools*, U.S. Dept. of Health & Hum. Servs. and Fed. Trade. Comm'n (July 20, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf.
[24] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).
[25] *HIPAA For Professionals*, HHS.gov, https://www.hhs.gov/hipaa/for-professionals/index.html (last accessed Apr. 10, 2025).

present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

86.     Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

     a.   Names;

     b.   Medical record numbers;

     c.   Account numbers;

     d.   Device identifiers and serial numbers;

     e.   Web Universal Resource Locators (URLs);

     f.   Internet Protocol (IP) address numbers; … and

     g.   Any other unique identifying number, characteristic, or code…; and "[t]he covered entity must not have actual knowledge that the information could be used alone or in combination with other information to identify an induvial who is a subject of the information."

45 C.F.R. § 160.514.

87.     The HIPAA Privacy Rule requires any "covered entity" to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

88.     An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The

statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

89.     The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Blue Shield when it is knowingly disclosing individually identifiable health information relating to an individual, as those terms are defined under HIPAA.

90.     Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C.§1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

91.     In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the HHS instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[26]

92.     In its guidance for Marketing, the HHS further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information

---

[26] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, HHS.gov, (Nov. 26, 2012), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

**CLASS ACTION COMPLAINT**

to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (Emphasis added).[27]

93.    As alleged above, there is an HHS Bulletin that highlights the obligations of "regulated entities," which are HIPAA-covered entities and business associates, when using tracking technologies.

94.    The HHS Bulletin expressly provides that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."

95.    As noted by the Hon. William J. Orrick in a decision concerning the use of Tracking Tools by healthcare organizations:

> "[o]ur nation recognizes the importance of privacy in general and health information in particular: the safekeeping of this sensitive information is enshrined under state and federal law. The allegations against [defendant] are troubling: Plaintiff raise potentially strong claims on the merits and their alleged injury would be irreparable if proven."[28]

96.    The information Blue Shield divulged to unauthorized third parties, such as Google, allowed those entities to learn that specific individuals were patients seeking and receiving treatment with providers covered by Blue Shield's insurance plan, and that they were seeking to submit claims, pay bills, and receive other health care related services. In turn, this information was used and/or sold to additional unauthorized parties for use in marketing and geotargeting.

97.    Neither Plaintiff nor Class Members signed a written authorization permitting Blue Shield to send their Personal Information to Google, or any other unauthorized third party.

98.    On information and belief, Blue Shield does not have a HIPAA compliant Business Associate Agreement in place with Google.

99.    Defendant's actions violated HIPAA Rules.

---

[27] *Marketing*, OCR HIPAA Privacy, Apr. 3, 2003, https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.
[28] *In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO, 2022 WL 17869218, at *1 (N.D. Cal. Dec. 22, 2022)

**CLASS ACTION COMPLAINT**

**IP Addresses, Mobile Advertising IDs, and Other Device Identifiers Constitute Personally Identifying Information**

100.    Blue Shield also disclosed and otherwise assisted third parties with intercepting Plaintiff's and Class Members' IP addresses, Mobile Advertising IDs, and other device identifiers that are uniquely linked to specific individuals.

101.    An IP address is a number that identifies the address of a device connected to the Internet, and it is used to identify and route communications on the Internet.

102.    Internet service providers, websites, and third-party tracking companies use individual's IP addresses to facilitate and track Internet communications.

103.    Blue Shield used Google Analytics tools, Google Tag Manager, and DoubleClick tracking tools without anonymizing users' IP addresses.

104.    Under HIPAA, an IP address is considered personally identifiable information:

- HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. See 45 C.F.R. § 164.514 (2).

- HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); See also, 45 C.F.R. §164.514(b)(2)(i)(O).

105.    Consequently, by disclosing IP addresses, Blue Shield's business practices violated HIPAA and industry privacy standards.

106.    Likewise, on information and belief, the Tracking Tools used by Blue Shield also transmitted users' Mobile Advertising IDs ("MAID") and may have transmitted AAID (Android Advertising ID), Router SSID, Hardware ID, IMEI (International Mobile Equipment Identity), and other persistent identifiers.

107.    According to the FTC, "MAIDs and other persistent identifiers, by design, enable direct communication with individual consumers, are used to amass profiles of individuals over time and

**CLASS ACTION COMPLAINT**

across different web and mobile services, and are the basis to make decisions and insights about individual consumers."[29]

**Plaintiff's Experience with Blue Shield**

108.    Plaintiff Heck was a member of Blue Shield from January 2019 through December 2023.

109.    As a member of Blue Shield's insurance plans, and in order to obtain medical treatment and insurance services, Plaintiff accessed and used Blue Shield's Web Properties on his computer. He has used the same device to access his Google account and email, and he often stays logged into these accounts.

110.    Plaintiff Heck communicated his Personal Information to Blue Shield when he used their Web Properties, including using the "Find a Doctor" form and webpage to identify an in-network healthcare provider.

111.    More specifically, he recalls using the "Find a Doctor" filtering feature available to obtain the narrowest selection, which communicated the following: (1) the type of physician or medical provider he was seeking; (2) the specific medical services he was seeking; (3) the type of care sought during his visit; (4) his location; and (5) additional details about his desired physician and their practice area.

112.    Due to the way Blue Shield configured its Tracking Tools, upon entering his Personal Information and clicking the "Search" button, Plaintiff's search parameters and the contents of his communications were sent to Google alongside his IP address, Google Client ID, and additional persistent identifiers that reveal his real-world identity.

113.    Plaintiff Heck reasonably expected that—as a health plan member seeking medical treatment and services—his Personal Information and communications were confidential and would not be received by Google or other unknown third-parties, or used for marketing purposes, without his express written consent.

---

[29] *See In the Matter of Gravy Analytics, Inc., and Venntel, Inc.,* Federal Trade Commission No. 212-3035, https://www.ftc.gov/system/files/ftc_gov/pdf/2123035gravyanalyticscomplaint.pdf (last accessed Apr.10, 2025).

**CLASS ACTION COMPLAINT**

114.    However, on April 9, 2025, he received an email from Blue Shield, informing him about the Data Disclosure, and informing him that certain elements of his protected health information may have been accessed, acquired, used, or disclosed to a third party.

115.    The risk to Plaintiff's and other patients' privacy is ongoing in nature because the Personal Information Google received can be kept and used for years to come. Additionally, a portion of Google's Tracking Tools are still operating on Blue Shield's Web Properties as of April 10, 2025.

116.    Importantly, many companies are using data obtained by Tracking Tools to decide whether to raise insurance premiums or deny coverage.[30]

117.    By virtue of the allegations detailed in this Complaint, Blue Shield unlawfully disclosed Plaintiff's Personal Information to third parties, including by use of the Tracking Tools, breached the confidentiality of his Personal Information, and violated his right to privacy.

118.    Plaintiff was unaware that Blue Shield installed Tracking Tools on its Web Properties because, amongst other things, the Tracking Tools were and are completely invisible, and Plaintiff reasonably believed his health insurance provider would safeguard his privacy in compliance with industry standards, HIPAA, and relevant laws.

119.    Plaintiff has a continuing interest in ensuring that his Personal Information is safeguarded from future unauthorized disclosure and in knowing the precise categories of information disclosed, to whom it was disclosed, and why it was disclosed.

**Plaintiffs and Class Members Were Harmed While Blue Shield Benefitted**

120.    The Tracking Tools served the sole purpose of bolstering Blue Shield's profits via marketing and advertising.

---

[30] *See In re Consumer Vehicle Driving Data Tracking Litig*., 737 F. Supp. 3d 1355 (U.S. Jud. Pan. Mult. Lit. 2024)(alleging General Motors and OnStar improperly used Tracking Tools to disseminate information to third-parties); *see also Plaintiff's Original Petition, The State of Texas v. The Allstate Corporation et al.,* Montgomery Cty. (Texas) No. 25-01-00561, (Jan. 13, 2025), https://www.texasattorneygeneral.gov/sites/default/files/images/press/Allstate%20and%20Arity%20Petition%20Filed.pdf ).

121.     In exchange for bartering away and disclosing the Personal Information of its patients and customers, Blue Shield was and is compensated by Google in the form of enhanced advertising services and more cost-efficient marketing.

122.     Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its marketing campaign, Blue Shield re-targeted patients and potential patients.

123.     By utilizing the Tracking Tools, the cost of advertising and retargeting was reduced, thereby benefiting Blue Shield.

124.     Blue Shield's disclosure of Personal Information harmed Plaintiffs and the Class. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is expected to continue to increase and estimates for 2022 were as high as $434 per user, constituting over $200 billion industry wide.

125.     The value of health data in particular is well-known. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data, observing that the market for this data is both lucrative and a significant risk to privacy.[31]

126.     Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[32] Accordingly, patient data that can be linked to a specific individual is even more valuable.

127.     There is also a market for data in which consumers can participate. For instance, several companies have products through which they pay consumers for a license to track their data. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing historical information.

---

[31] Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, TIME, (Jan. 9, 2017), https://time.com/4588104/medical-data-industry/.

[32] Christina Farr, *Hospital execs say they are getting flooded with requests for your health* data, CNBC, (Dec. 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

**CLASS ACTION COMPLAINT**

128.   Meta also has paid users for their digital information, including browsing history. Until 2019, Meta ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

129.   Additionally, healthcare data is extremely valuable to bad actors. Healthcare records may be valued at up to $250 per record on the black market.[33]

130.   Personal Information has private value beyond its use as a bare commodity.[34] The value of Personal Information is thus inherently related to the value of privacy, which is a question that has been researched in multiple fields including decision science, economics, information systems, management, health care, and marketing.[35] This research has approached the valuation of personal information from multiple perspectives:[36]

    a.   The amount one would accept to relinquish their data;

    b.   The amount one would spend to protect their data;

    c.   The potential harm from data exposure; and

    d.   The benefit a data holder could gain from acquiring data.

131.   These approaches can be used to establish a set of data points for the reasonable estimation of the value of Personal Information and non-public medical information such as patient status.

---

[33] Tori Taylor, *Hackers, Breaches, and the Value of Healthcare Data,* SecureLink (June 30, 2021), https://www.securelink.com/blog/healthcare-data-new-prize-hackers.
[34] Wagner, et al., *Putting a Price Tag on Personal Information – A Literature Review*, Proceedings of the 51st Hawaii Int'l Conf. on System Sciences (2018) https://scholarspace.manoa.hawaii.edu/server/api/core/bitstreams/67cd4c6f-f8ad-495c-a800-13b36987238f/content; Alessandro Acquisti, et al., *The Economics of Privacy*, Journal of Economic Literature 2016, 54(2) pgs. 442–492 (2016), https://pubs.aeaweb.org/doi/pdfplus/10.1257/jel.54.2.442; Li, Xiao-Bai, et al. *Valuing Personal Data with Privacy Consideration*, Decision Sciences Vol. 52, 2 (2021), 393-426, https://doi.org/10.1111/deci.12442 arXiv:https://onlinelibrary.wiley.com/doi/pdf/10.1111/deci.12442.
[35] Fehrenbach David & Carolina Herrando, *The Effect of Customer-Perceived Value When Paying for a Product with Personal Data: A Real-Life Experimental Study*, Journal of Business Research Vol. 137, 222-232 (Dec. 2021), https://www.sciencedirect.com/science/article/pii/S0148296321005907; Li, Xiao-Bai, *supra*; Alorwu, et al. *Monetary valuation of personal health data in the wild*, Int'l J. of Human-Computer Studies, Vol. 185 (May 2024), https://www.sciencedirect.com/science/article/pii/S1071581924000259.
[36] Acquisti, et al., *supra*.

**CLASS ACTION COMPLAINT**

132.    In addition, numerous services exist that charge fees to monitor and remove Personal Information from data brokers and search databases. For example, Privacy Bee charges $216 per year for its Pro service and $804 per yaer for its Signature service.[37] Other similar services exist today, such as DeleteMe®, which removes information from all major data broker websites for $129 per year,[38] deleteme™ which charges one-time fees ranging from $100 to $500 for search engine and data breach removals,[39] Incogni.com which charges $179 per year to remove information from major data broker websites and search databases,[40] and ReputationDefender, a service that charges $99 per year to remove personal information from various databases.[41] These provide a baseline market valuation of personal information.

## TOLLING

133.    Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff did not know (and had no way of knowing) that his Personal Information was intercepted and unlawfully disclosed to Google or any other third-parties in the manner described herein because: (1) Blue Shield kept this information secret, and (2) the Tracking Tools are invisible on Defendant's the Web Properties.

## CLASS ACTION ALLEGATIONS

134.    Plaintiff brings this action on behalf of himself and, under Federal Rules of Civil Procedure 23(a) and (b), as representing the following class:

> **Nationwide Class:** All persons in the United States who visited or used Blue Shield's Web Properties and had their Personal Information disclosed to one or more third parties by Blue Shield, including all persons who received notice of the Data Disclosure from Blue Shield.

> **California Class:** All California residents who visited or used Blue Shield's Web Properties and had their Personal Information disclosed to one or more

---

[37] *Pricing*, Privacy Bee, privacybee.com/pricing/, (last accessed Apr. 10, 2025).
[38] *Privacy Protection Plans - JoinDeleteMe*, joindeleteme.com/pricing/, (last accessed Apr. 10, 2025).
[39] *Services Pricing*, deleteme.com/pricing-update/, (last accessed Apr. 10, 2025).
[40] *About Us*, incogni.com/pricing, (last accessed Apr. 10, 2025).
[41] *ReputationDefender signup*, me.reputationdefender.com, (last accessed Apr. 10, 2025). ReputationDefender was previously known as Reputation.com and has been offering this service since at least 2012. Also see: https://www.nytimes.com/2012/12/09/business/company-envisions-vaults-for-personal-data.html

**CLASS ACTION COMPLAINT**

third parties by Blue Shield, including all persons who received notice of the Data Disclosure from Blue Shield.

Excluded from the proposed classes are: Defendant, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and court staff assigned to this case.

135.   Numerosity: The members of the class are so numerous that joinder is impracticable. The exact number of Class Members is currently unknown to Plaintiff, however, the class includes thousands of members that are widely dispersed throughout the country.

136.   Typicality: Plaintiff's claims are typical of the claims of all class members.  Plaintiff's claims arise out of a common course of conduct that gives rise to the claims of all other class members. Plaintiffs and all class members were and will continue to be damaged in the same manner by the same wrongful conduct, namely Blue Shield's practice of disclosing Personal Information to third parties via the use of its Tracking Tools.

137.   Adequacy: Plaintiff's interests are aligned with the Class(es) Plaintiff seeks to represent, and Plaintiff has retained counsel with significant experience prosecuting complex class action cases, including cases involving alleged privacy and data security violations. Plaintiff and undersigned counsel intend to prosecute this action vigorously. The Class(es)' interests are well-represented by Plaintiff and undersigned counsel.

138.   Commonality and Predominance: The following questions common to all Class Members predominate over any potential questions affecting individual Class Members:

a.   Whether Blue Shield's conduct constitutes negligence per se;

b.   Whether Blue Shield's invaded the privacy rights of Plaintiff and Class Members through its conduct, including by using Tracking Tools to communicate patients' PII and PHI to third parties;

c.   Whether Blue Shield entered into implied contracts with Plaintiff and Class Members;

d.   Whether Blue Shield breached any implied contracts with Plaintiff and Class Members;

- 25 -

**CLASS ACTION COMPLAINT**

e.  Whether Blue Shield violated the CMIA, CCPA, CIPA, UCL, or other statutory provisions requiring the protection of Personal Information;

f.  Whether Blue Shield's actions violated HIPAA, including by requiring patients to affirmatively opt-out of having their information shared for marketing purposes;

g.  Whether Blue Shield was unjustly enriched by its conduct;

h.  Whether the Web Properties surreptitiously track PII, PHI, and related communications and simultaneously disclose(d) that information to Google and/or other third parties;

i.  Whether Blue Shield's disclosures of PII, PHI, and related communications constitute an affirmative act of communication;

j.  Whether Blue Shield's conduct, which allowed third parties to view Plaintiff's and Class Members' PII and PHI, resulted in a breach of confidentiality;

k.  Whether Plaintiff and Class Members are entitled to damages under CIPA, the CMIA, or any other relevant statute; and

l.  Whether Blue Shield's actions violated Plaintiff's and Class Members' privacy rights as provided by the California Constitution.

139.  <u>Superiority</u>: A class action is the superior—and only realistic—mechanism to fairly and efficiently adjudicate Plaintiff's and other Class Member's claims. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for Class Members individually to effectively redress Defendant's wrongdoing. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

140.  Plaintiff reserves the right to seek class certification with respect to common issues, including issues related to Defendant's duties or conduct.

**CLASS ACTION COMPLAINT**

## CAUSES OF ACTION – NATIONWIDE CLASS

### COUNT I
### Negligence
### (On behalf of Plaintiff and the Nationwide Class)

141.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

142.    As a condition of receiving health insurance and related services, Plaintiff and Class Members were obligated to provide Blue Shield with their Personal Information.

143.    Plaintiff and Class Members entrusted their Personal Information to Blue Shield with the understanding that Blue Shield would safeguard their information.

144.    Blue Shield knew the risks of collecting and storing Personal Information and the importance of securing such information from being disclosed to unauthorized third parties.

145.    Blue Shield had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, obtained, or disclosed to unauthorized parties. This duty includes, among other things, designing, and/or configuring its tracking software, including the Tracking Tools, to ensure that the Personal Information it received was adequately secured and protected.

146.    Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures, including any configurations of the Tracking Tools that disclosed Personal Information. Defendant knew of or should have known of the inherent risks in collecting, storing, and/or tracking the Personal Information of Plaintiffs and Class Members, and the critical importance of providing adequate security of that Personal Information.

147.    Blue Shield's own conduct created a foreseeable risk of harm to Plaintiff and Class Members. Defendant's misconduct included, but was not limited to, their failure to take the steps and opportunities to prevent the Data Disclosure as set forth herein. Defendants' misconduct also included their decision not to comply with HIPAA and industry standards for the safekeeping and authorized disclosure of the Personal Information of Plaintiff and Class Members.

**CLASS ACTION COMPLAINT**

148.     As set forth above, Plaintiff and Class Members had no ability to protect their Personal Information that they submitted to Blue Shield or that was otherwise in Blue Shield's possession, in part because Blue Shield's use of the Tracking Tools was not made known to Plaintiff or Class Members.

149.     Blue Shield was in a position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Disclosure.

150.     Blue Shield had a duty to put proper procedures in place to prevent the unauthorized dissemination of Plaintiff's and Class Members' Personal Information.

151.     Blue Shield admitted in its "Notice of Data Breach" that Plaintiff's and Class Members' Personal Information was wrongfully disclosed to unauthorized third persons as a result of the Data Disclosure.

152.     Blue Shield, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' Personal Information that was within Blue Shield's possession or control.

153.     Blue Shield improperly and inadequately safeguarded Plaintiff's and Class Members' Personal Information in deviation of standard industry rules, regulations and practices at the time of the Data Disclosure.

154.     Blue Shield, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to have appropriate procedures in place to detect and prevent disclosure of its Plaintiff's and Class Members' Personal Information.

155.     But for Blue Shield's wrongful and negligent breach of duties owed to Plaintiff and Class Members, Plaintiff's and Class Members' Personal Information would not have been disclosed and/or subsequently misused by unauthorized third parties, including, but not limited to, for commercial/advertising purposes.

156.     There is a temporal and close causal connection between Blue Shield's failure to protect the Personal Information and the harm suffered by Plaintiff and the Class.

**CLASS ACTION COMPLAINT**

157.   Further, Blue Shield owed Plaintiff and Class Members additional duties to exercise reasonable care in safeguarding and protecting their Personal Information it its possession, custody, or control.

158.   These duties arose from both the state and federal laws requiring the protection of Personal information, as described herein, and due to Blue Shield's own representations to Plaintiff and Class Members that it would protect their Personal Information.

159.   Blue Shield's duties arose from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules"). Blue Shield further had duties under the California Invasion of Privacy Act, Cal. Penal Code § 631, *et seq.* ("CIPA"), the California Confidentiality of Medical Information Act, Cal. Civ. Code § 56, *et seq.* ("CMIA"), and the California Consumer Privacy Act Cal. Civ. Code § 1798.100, *et seq.* ("CCPA"), to keep the Personal Information of Plaintiff and Class Members secure from disclosure to third parties.

160.   Violations of statutes which establish a duty to take precautions to protect a particular class of persons from a particular injury or type of injury may constitute negligence *per se*.

161.   Blue Shield breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Personal Information from disclosure to third parties.

162.   More specifically, Blue Shield breached its duties when it configured its Tracking Tools in a way that permitted the disclosure of Plaintiff's and Class Members' Personal Information to third parties such as Google, as alleged herein.

163.   Blue Shield further failed to design, adopt, implement, control, direct, oversee, and/or manage appropriate data security processes, policies, and/or procedures that would protect Plaintiff's and Class Members' Personal Information from disclosure to third parties.

164.   It was reasonably foreseeable to Blue Shield that its failure to protect Plaintiff's and Class Members' Personal information, including by failing to adequately configure its Tracking Tools

in a way that did not disclose Personal Information, would result in the disclosure of Plaintiff's and Class Members' Personal information to unauthorized third parties.

165.    But for Blue Shield's negligent conduct and/or breach of the above-described duties owed to Plaintiff and Class Members, their Personal Information would not have been disclosed to unauthorized third parties.

166.    Blue Shield violated HIPAA Privacy and Security Rules, the CIPA, the CMIA, and the CCPA by failing to use reasonable measures to protect Plaintiff's and all other Class Members' Personal Information and by not complying with applicable industry standards. Blue Shield's conduct was particularly unreasonable given the nature and amount of Personal Information it obtains, and the substantial damages that would result to Plaintiff and the other Class Members from the disclosure of their Personal information.

167.    Blue Shield's violation of HIPAA Privacy and Security Rules, the CIPA, the CMIA, and the CCPA constitute negligence *per se*.

168.    Plaintiff and Class Members are within the class of persons that these rules were designed and intended to protect.

169.    The harm occurring as a result of the Data Disclosure is the type of harm HIPAA Privacy and Security Rules, the CIPA, the CMIA, and the CCPA were intended to guard against.

170.    It was reasonably foreseeable to Blue Shield that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Personal Information from disclosure, including by failing to design, adopt, implement, control, direct, oversee, manage, and/or monitor appropriate data security processes, policies and/or procedures, would result in the release, disclosure, and dissemination of Plaintiff's and Class Members' Personal Information to unauthorized individuals, including Google.

171.    As a result of Blue Shield's above-described wrongful actions, inaction, and want of ordinary care, and its negligence per se, that directly and proximately caused the Data Disclosure, Plaintiff and Class Members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) improper disclosure, publication, and use of their Personal Information, including use for commercial purposes; (ii) breach of the confidentiality of their

Personal Information; (iii) deprivation of the value of their Personal Information, for which there is a well-established national and international market; and (iv) the continued risk to their Personal Information which, on information and belief, remains in both Blue Shield's and Google's possession.

### COUNT II
### Common Law Invasion of Privacy
### (On behalf of Plaintiff and the Nationwide Class)

172.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

173.    Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Blue Shield via its Web Properties.

174.    Plaintiff's and Class Members' Personal Information, including their communications and sensitive data, are private facts that Blue Shield disclosed to third parties without the knowledge or consent of Plaintiff and Class Members.

175.    Plaintiff and Class Members communicated sensitive PHI and PII that they intended for only Blue Shield to receive and which they understood Blue Shield would keep private as their insurance provider and healthcare provider.

176.    Blue Shield's disclosure of the substance and nature of Plaintiff's and Class Members' communications to third parties without their knowledge and consent is an intentional intrusion on Plaintiff's and Class Members' solitude or seclusion.

177.    By failing to keep Plaintiff's and Class Members' Personal Information safe, knowingly configuring its Tracking Tools in a way that disclosed Plaintiff's and Class Members' Personal Information, and disclosing Personal Information to unauthorized parties for unauthorized use, Blue Shield unlawfully invaded Plaintiff's and Class Members' privacy by, *inter alia*:

      a.  intruding into Plaintiff's and Class Members' private affairs in a manner that would be highly offensive to a reasonable person;

      b.  invading Plaintiff's and Class Members' privacy by improperly using their Personal Information properly obtained for a specific purpose for another purpose, or disclosing it to some third party;

c.  failing to adequately secure Personal Information from disclosure to unauthorized persons; and

d.  enabling the disclosure of Plaintiff's and Class Members' Personal Information without consent.

178.  Plaintiff and Class Members did not know that Blue Shield was using software to track and disclose their Personal Information.

179.  Plaintiff and Class Members had a reasonable expectation that their communications, identity, health information and other data would remain confidential, and that Blue Shield would not install software or use source code that would track their communications.

180.  Blue Shield was authorized to receive Plaintiff's and Class Members' Personal Information, but it was not authorized to commandeer Plaintiff's and Class Members' web browsers and devices, thereby forcing those devices to transmit information to Google without their consent or authorization.

181.  As such, Blue Shield obtained Plaintiff's and Class Members' Personal Information under false pretenses and/or exceeded its authority to obtain the Personal Information.

182.  Blue Shield's surreptitious tracking and commoditization of Plaintiff's and Class Members' Personal Information is highly offensive to a reasonable person, particularly given that Blue Shield provides health insurance and partners with healthcare providers to offer medical services.

183.  In disseminating Plaintiff's and Class Members' Personal Information to third parties without their consent, Defendant knew, or acted with reckless disregard of the fact that, a reasonable person in Plaintiff's and Class Members' position would consider its actions highly offensive.

184.  As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

185.  Defendant invaded Plaintiff's and Class Members' right to privacy and intruded into Plaintiff's and Class Members' private affairs by disclosing their Personal Information to unauthorized persons without their informed, voluntary, affirmative, and clear consent.

186.  As a proximate result of such unauthorized disclosures, Plaintiff's and Class Members' reasonable expectations of privacy in their Personal Information was unduly frustrated and thwarted.

1   Defendant's conduct amounted to a serious invasion of Plaintiff's and Class Members' protected privacy

2   interests.

3       187.    In failing to protect Plaintiff's and Class Members' Personal Information, and in

4   disclosing Plaintiff's and Class Members' Personal Information, Defendant acted with malice and

5   oppression and in conscious disregard of Plaintiff's and Class Members' rights to have such information

6   kept confidential and private.

7       188.    Plaintiff seeks injunctive relief on behalf of the Class, restitution, and all other damages

8   available under this Count.

9
                                    **COUNT III**
10                          **Breach of Implied Contract**
                  **(On behalf of Plaintiff and the Nationwide Class)**
11

12      189.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth

13  herein.

14      190.    In connection with receiving healthcare services, including insurance from Blue Shield,

15  and providing Blue Shield with their Personal Information in conjunction with such services, Plaintiff

16  and other Class Members entered into implied contracts with Blue Shield that Blue Shield would protect

17  Plaintiff and Class Members' Personal information.

18      191.    Pursuant to these implied contracts, Plaintiff and all other Class members paid money

19  to Blue Shield, including in the form of premiums, and provided Blue Shield with their Personal

20  Information. In exchange, Blue Shield agreed to, among other things, and Plaintiff understood that Blue

21  Shield would: (1) provide medical insurance services to Plaintiff and Class Members; (2) take

22  reasonable measures to protect the security and confidentiality of Plaintiff's and Class Members'

23  Personal Information; and (3) protect Plaintiff's and Class Members' Personal Information in

24  compliance with federal and state laws and regulations and industry standards.

25      192.    These promises are implied both from Blue Shield's conduct, and the representations it

26  made to Plaintiff and Class Members via its various privacy policies.

27      193.    The protection of Personal Information was a material term of implied contracts between

28  Plaintiff and Class Members, on the one hand, and Blue Shield, on the other hand. Indeed, as set forth,

**CLASS ACTION COMPLAINT**

*supra*, Blue Shield recognized the importance of data security and privacy of its patients' Personal Information in its various privacy notices. Had Plaintiff and Class Members known that Blue Shield would not adequately protect its members' and former members' Personal Information, they would not have received insurance and/or services from Blue Shield.

194.    Plaintiff and Class Members performed their obligations under the implied contract when they provided Blue Shield with their Personal Information and paid their insurance premiums.

195.    Blue Shield breached its obligations under its implied contracts with Plaintiff and Class members in failing to implement and maintain reasonable security measures to protect and secure their Personal Information including by utilizing certain Tracking Tools on its Web Properties that resulted in the disclosure of Plaintiff and Class Members' Personal Information to third parties, including Google.

196.    Blue Shield's breach of its obligations of its implied contracts with Plaintiff and Class Members directly resulted in the unauthorized disclosure of Plaintiff's and Class Members' sensitive personal and health information and the injuries that Plaintiff and all other Class Members have suffered as a result.

197.    Plaintiff and all other Class Members were damaged by Blue Shield's breach of implied contracts because: (i) they paid for data security protection they did not receive; (ii) their Personal Information has been disclosed to third parties who will use or have used that information for unauthorize purposes; (iii) the confidentiality of their Personal Information has been breached; and (iv) they were deprived of the value of their Personal Information, for which there is a well-established national and international market.

## COUNT IV
## Unjust Enrichment
### (On behalf of Plaintiff and the Nationwide Class)

198.    Plaintiff realleges and incorporate by reference all preceding paragraphs as if fully set forth herein.

199.    This claim is pleaded in the alternative to the breach of implied contract claim.

**CLASS ACTION COMPLAINT**

200.    Plaintiff and Class Members conferred a monetary benefit upon Blue Shield in the form of monies paid for healthcare services or health insurance premiums.

201.    Blue Shield accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. Blue Shield also benefitted from the receipt of Plaintiff's and Class members' Personal Information, as this information was used, among other things, to facilitate payment and make insurance claims and connect members with in-network providers.

202.    As a result of Blue Shield's conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures (that Plaintiff's and Class Members paid for), and those payments without reasonable data privacy and security practices and procedures (that they received).

203.    Blue Shield should not be permitted to retain the money belonging to Plaintiff and Class Members because it failed to adequately implement the data privacy and security procedures for itself that Plaintiff and Class Members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

204.    Blue Shield should be compelled to provide for the benefit of Plaintiff and Class Members all unlawful proceeds received by it as a result of the conduct and Data Disclosure alleged herein, including, but not limited to any advertising savings it received by virtue of disclosing Plaintiff's and Class Members' Personal Information to Google.

**COUNT V**
**Declaratory Judgment/Injunctive Relief**
**(On behalf of Plaintiff and the Nationwide Class)**

205.    Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

206.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the laws and regulations described herein.

**CLASS ACTION COMPLAINT**

207.    As alleged herein, Blue Shield owes duties of care to Plaintiff and Class Members that require it to adequately secure Plaintiff's and Class Members' Personal Information.

208.    Blue Shield still possesses, and continues to receive, the Personal Information of Plaintiff and the Class Members.

209.    Blue Shield has not satisfied its contractual obligations and legal duties to Plaintiff and the Class Members and has violated various statutory duties to Plaintiff and Class Members, as described herein.

210.    An actual controversy has arisen and exists between Plaintiff and Class Members, on the one hand, and Blue Shield, on the other hand, concerning the Data Disclosure and Blue Shield's failure to protect Plaintiff's and Class Members' Personal Information, including with respect to the issue of whether Blue Shield took adequate steps to prevent the disclosure of Plaintiff and Class Members' Personal Information to third parties. Plaintiff and Class Members are entitled to judicial determination as to whether Defendant has performed and is adhering to all data privacy obligations as required by law or otherwise to protect Plaintiff's and Class Members' Personal Information from unauthorized access, disclosure, and use.

211.    Plaintiff and Class Members therefore, seek a declaration (1) that Blue Shield's existing data security measures and/or Tracking Tool configurations do not comply with its contractual obligations, statutory duties and/or common law duties of care to protect Plaintiff and Class Members' Personal Information, and (2) that to comply with its duties to protect this Personal Information, Blue Shield must take action including, but not limited to, the following:

        a.   Retrieve the Personal Information of Plaintiff and Class Members that it disclosed to third parties during the Data Disclosure, including, but not limited to, the Personal information it disclosed to Google;

        b.   Confirm that the current configuration of their Tracking Tools discloses no PII or PHI to third parties, including, but not limited to Google; and

        c.   Sanitize their Web Properties to ensure that there are no residual Tracking Tools in effect which may inadvertently disclose further PII or PHI of Plaintiff and Class Members to third parties, including, but not limited to, Google.

## CAUSES OF ACTION – CALIFORNIA CLASS

### COUNT VI
### Violation of the California Confidentiality of Medical Information Act
### Cal. Civ. Code § 56, et seq.
### (On behalf of Plaintiff and the California Class)

212. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

213. This cause of action is plead in the alternative to the cause of action for violation of the California Consumer Privacy Act.

214. The California Confidentiality of Medical Information Act, Cal. Civ. Code § 56, *et seq*. ("CMIA") prohibits health care service plans from disclosing medical information relating to their patients without a patient's express authorization.

215. Medical information refers to "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care… regarding a patient's medical history, mental or physical condition, or treatment."

216. "'Individually identifiable' means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual..." Cal. Civ. Code § 56.05.

217. A health care provider that maintains information for purposes covered by the CMIA is liable for negligent disclosures that arise as the result of an affirmative act—such as implementing a system that records and discloses online patients' personally identifiable information and protected health information. Cal. Civ. Code § 56.36(c).[42] Similarly, if a negligent release occurs and medical information concerning a patient is improperly viewed or otherwise accessed, the individual need not suffer actual damages. Cal. Civ. Code § 56.36(b).

---

[42] "Every provider of health care ... who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein. Any provider of health care ... who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36." (§ 56.101, subd. (a).)

218.    "In addition to any other remedies available at law, any individual may bring an action against any person or entity who has negligently released confidential information or records concerning them in violation of this part, for either or both of the following: [¶] (1) ... nominal damages of one thousand dollars ($1,000). To recover under this paragraph, it shall not be necessary that the Plaintiffs suffered or was threatened with actual damages. [¶] (2) The amount of actual damages, if any, sustained by the patient."[43]

219.    Defendant is a health care service plan as defined by Cal. Civ. Code § 56.06.

220.    Plaintiff and Class Members are members of Blue Shield and, as a health care service plan, Blue Shield has an ongoing obligation to comply with the CMIA's requirements with respect to Plaintiff's and Class Members' confidential medical information.

221.    As set forth above, names, addresses, telephone numbers, email addresses, device identifiers, web URLs, IP addresses, city and zip code, and other characteristics that can uniquely identify Plaintiffs and Class Members are transmitted to Google in combination with insurance information, medical conditions, medical concerns, treatment(s) sought by the patients, attempts to pay bills, and other patient searches and queries. This PHI and PII constitutes confidential information under the CMIA.

222.    Pursuant to the CMIA, the information communicated to Blue Shield and disclosed to Google and other third parties constitutes medical information because it is information derived from a health care service plan member regarding a patient's medical treatment and physical condition and is received in combination with individually identifying information. Cal. Civ. Code §56.05(g) and 56.05(j).

223.    As set forth above, Google views, processes, and analyzes the confidential medical information it receives via Google Analytics. Google then uses the viewed confidential information for advertising and marketing purposes.

---

[43] See *Sutter Health v. Superior Ct.*, 227 Cal. App. 4th 1546, 1551 (2014) (quoting Cal. Civ. Code § 56.36(b)).

**CLASS ACTION COMPLAINT**

224.    Defendant failed to obtain Plaintiff's and Class Members' authorization for the disclosure of medical information.

225.    Pursuant to CMIA Section 56.11, a valid authorization for disclosure of medical information must: (1) be "clearly separate from any other language present on the same page and … executed by a signature which serves no other purpose than to execute the authorization;" (2) be signed and dated by the patient or their representative; (3) state the name and function of the third party that receives the information; and (4) state a specific date after which the authorization expires. The information set forth on Blue Shield's Web Properties, including the website's Privacy Policy and Notice of Privacy Practices, does not qualify as a valid disclosure or authorization.

226.    Defendant violated the CMIA by disclosing its patients' medical information to Google along with the patients' individually identifying information.

227.    Plaintiff and Class Members seek nominal damages, compensatory damages, punitive damages, attorneys' fees, and costs of litigation for Defendant's violations of the CMIA.

**COUNT VII**
**Violations of the California Consumer Privacy Act**
**Cal. Civ. Code § 1798.100, et seq. ("CCPA")**
**(On behalf of Plaintiff and the California Class)**

228.    Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

229.    This cause of action is plead in the alternative to the cause of action for violation of the California Medical Information Act.

230.    The CCPA was enacted to protect consumers' sensitive information from collection and use by businesses without appropriate notice and consent.

231.    Through the conduct complained of herein, Blue Shield violated the CCPA by subjecting Plaintiff's and California Class Members' Personal Information to unauthorized access and/or disclosure as a result of Blue Shield's violation of its duties to implement and maintain reasonable security procedures and practices appropriate to the nature and protection of that information. Cal. Civ. Code § 1798.150(a).

**CLASS ACTION COMPLAINT**

232.    In accordance with Cal. Civ. Code §1798.150(b), on April 11, 2025, prior to the filing of this Complaint, Plaintiff's counsel served Blue Shield with notice of their CCPA violations by certified mail, return receipt requested.

233.    Plaintiff currently seeks only injunctive relief in the form of an order enjoining Blue Shield from continuing to violate the CCPA.

234.    If Blue Shield fails to agree to rectify the violations detailed herein, Plaintiff will seek leave to amend this Complaint to seek actual, punitive, and statutory damages, restitution, and any other relief the Court deems proper as a result of Blue Shield's CCPA violation.

**COUNT VIII**
**Violations of the California Invasion of Privacy Act,**
**Cal. Penal Code § 631**
**(On behalf of Plaintiff and the California Class)**

235.    Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

236.    The California Legislature enacted the California Invasion of Privacy Act ("CIPA") to protect the privacy rights of California citizens.

237.    CIPA is codified at Cal. Penal Code§§ 630 to 638. The Act begins with its statement of purpose.

> The Legislature thereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

238.    California Penal Code § 631(a) provides, in pertinent part (emphasis added):

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner … willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or **who aids, agrees with, employs, or conspires** with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things

**CLASS ACTION COMPLAINT**

mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500).

239.    Violations of CIPA are not limited to phone lines but also apply to "new technologies" such as computers, the Internet, and email.[44]

240.    CIPA affords a private right of action to any person who has been subjected to a violation of the statute to seek injunctive relief and statutory damages of $5,000 per violation, regardless as to whether they suffered actual damages. Cal. Penal Code § 637.2(a)(1).

241.    Under CIPA, Blue Shield must show it had the consent of all parties to a communication.

242.    At all relevant times, Blue Shield aided, employed, agreed with, and conspired with third parties, including Google, to track and intercept Plaintiff's and Class Members' internet communications. These communications were transmitted to and intercepted by a third party during the communication and without the knowledge, authorization, or consent of Plaintiff and Class Members.

243.    Blue Shield intentionally inserted an electronic listening device onto Plaintiff's and Class Members' web browsers and devices that, without their knowledge and consent, tracked and transmitted the substance of their confidential communications to Google and other unauthorized third parties—each of whom constitute a "person" within the meaning of the statute.

244.    Blue Shield willingly facilitated the interception and collection of Plaintiff's and Class Members' Personal Information by embedding certain Tracking Tools, including Google Analytics, on its Web Properties.

245.    Moreover, unlike past business tools such as the Facebook Like Button and older web beacons, Google Tag Manager, Google Analytics, and the other Tracking Tools are: (1) completely invisible to website and app users; and (2) Blue Shield has full control over these tools, including where they are embedded, what information is tracked and transmitted, and how events are categorized prior to their transmission.

---

[44] *See In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

**CLASS ACTION COMPLAINT**

246. Blue Shield's Tracking Tools constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, they fall under the broad catch-all category of "any other manner."

247. Blue Shield failed to disclose its use of the Tracking Tools to specifically track and automatically and simultaneously transmit Plaintiff's and Class Members' communications to Google and other undisclosed third-parties.

248. A portion of the Tracking Tools—such as Google Analytics and Google Tag Manager—are designed to transmit a website user's actions and communications contemporaneously as the user initiates each communication. As a result, the user's communications are intercepted in transit to the intended recipient—Blue Shield—before reaching Blue Shield's server.

249. Blue Shield violated CIPA by aiding and permitting third parties to intercept and receive its patients' online communications in real time as they were made. Importantly, Google and other unauthorized third parties would not have intercepted or received the contents of these communications but for Blue Shield's actions, including its decision to install the Tracking Tools on its Web Properties.

250. By disclosing Plaintiff's and Class Members' Personal Information, Blue Shield violated Plaintiff's and Class Members statutorily protected right to privacy.

251. As a result of the above violations, and pursuant to CIPA Section 637.2, Blue Shield is liable to Plaintiff and Class Members for treble actual damages related to their loss of privacy in an amount to be determined at trial or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the Plaintiffs have suffered, or be threatened with, actual damages."

252. Under the statute, Blue Shield is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

/ / /

/ / /

/ / /

/ / /

**CLASS ACTION COMPLAINT**

1
2
3

**COUNT IX**
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 638.51(a)**
**(On behalf of Plaintiff and the California Class)**

4      253.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth
5   herein.

6      254.    CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or
7   a trap and trace device without first obtaining a court order."

8      255.    A "pen register" is a "device or process that records or decodes dialing, routing,
9   addressing, or signaling information transmitted by an instrument or facility from which a wire or
10  electronic communication is transmitted, but not the contents of the communication." Cal. Penal Code
11  § 638.50(b).

12     256.    The Tracking Tools are "pen registers" because they are device[s] or process[es]"that
13  "capture[d]" the "routing, addressing, or signaling information" from Plaintiffs and Class Members'
14  electronic communications.

15     257.    At all relevant times, Blue Shield installed the Tracking Tools—which are pen
16  registers—onto Plaintiff's and Class Members' browsers, and it used the Tracking Tools to collect
17  Plaintiff's and Class Members' Personal Information.

18     258.    Plaintiff and Class Members did not provide their consent to Blue Shield's installation
19  or use of the Tracking Tools.

20     259.    Blue Shield did not obtain a court order to install or use the Tracking Tools.

21     260.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by
22  Blue Shield's violations of CIPA § 638.51(a), and each seek statutory damages of $5,000 for each of
23  Blue Shield's violations of CIPA § 638.51(a).

24
25
26

**COUNT X**
**Violation of the Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200, et seq.**
**(On behalf of Plaintiff and the California Class)**

27     261.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth
28  herein.

**CLASS ACTION COMPLAINT**

262.    California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

263.    Blue Shield engaged in unlawful business practices in connection with its disclosure of Plaintiff's and Class Members' Personal Information to unauthorized third parties, including Google, in violation of the UCL.

264.    Blue Shield's acts, omissions, and conduct, as alleged herein, constitute "business practices" within the meaning of the UCL.

265.    Plaintiff and Class Members suffered injury in fact and lost money or property as a result of Blue Shield's misconduct, as alleged above, including, *inter alia*, the unauthorized release and disclosure of their Personal Information and lack of notice.

266.    But for Defendants' misrepresentations and omissions, Plaintiffs and Class Members would not have provided their Personal Information to Defendants, or would have insisted that their Personal Information be more securely protected.

267.    As a direct and proximate result of Defendant's unlawful practices and acts, Plaintiff and Class Members were injured and lost money or property, including but not limited to the price received by Defendant for the services provided to Plaintiff and Class Members, the loss of Plaintiff's and Class Members' legally protected interest in the confidentiality and privacy of their Private Information, nominal damages, and additional losses as described herein.

### Unlawful Prong

268.    Blue Shield violated the "unlawful" prong of the UCL by violating, *inter alia*, Plaintiff's and Class Members' constitutional rights to privacy, state and federal privacy statutes, and state consumer protection statutes, as set forth herein.

269.    Blue Shield further violated the "unlawful" prong of the UCL by failing to honor the terms of its implied contracts with Plaintiff and Class Members, as alleged herein.

270.    Blue Shield's conduct also undermines California public policy—as reflected in statutes like the CPPA, CMIA and CIPA—which seek to protect California consumer data and ensure that entities who solicit or are entrusted with Personal Information utilize reasonable security measures.

**Unfair Prong**

271.    Blue Shield's acts, omissions, and conduct also violate the unfair prong of the UCL because those acts, omissions, and conduct offend public policy (including the federal and state privacy statutes and state consumer protection statutes, such as the CIPA, CMIA, and HIPAA) and constitute immoral, unethical, oppressive, and unscrupulous activities that caused substantial injury, including to Plaintiff and Class Members.

272.    The harm caused by Blue Shield's conduct outweighs any potential benefits attributable to such conduct, and there were reasonably available alternatives to further Blue Shield's legitimate business interests other than Blue Shield's conduct described herein.

273.    The gravity of Blue Shield's conduct outweighs any potential benefits attributable to such conduct, and there were reasonably available alternatives to further Blue Shield's legitimate business interests, other than its conduct as described herein.

274.    Blue Shield's failure to adequately protect Plaintiff and Class Members' Personal Information from disclosure, and failure to inform Plaintiff and Class Members that it implemented Tracking Tools that disclosed their Personal Information to third parties is unethical, unscrupulous, and substantially injurious to the Class. While Defendant's competitors have spent the time and money necessary to appropriately safeguard their members' Personal Information, Defendant has not—to the detriment of its customers and to competition.

275.    Plaintiff and Class Members suffered from a loss of the benefit of their bargain with Blue Shield because they overpaid for insurance services they believed included data security sufficient to maintain their Personal Information as confidential and not disclose that information to third parties.

276.    As a result of Blue Shield's violations of the UCL, Plaintiff and Class Members are entitled to injunctive relief. This is particularly true since the dissemination of Plaintiff and Class Members' information is ongoing.

277.    As a result of Blue Shield's violations of the UCL, Plaintiff and Class Members have suffered injury in fact and lost money or property, including but not limited to payments to Blue Shield for services and/or other valuable consideration, *e.g.*, access to their private and personal data.

**CLASS ACTION COMPLAINT**

278.    Plaintiff and Class Members would not have used Blue Shield's services, or would have paid less for them, had they known Blue Shield was breaching confidentiality and disclosing their Personal Information to advertising and tech giants such as Google.

279.    The unauthorized access to Plaintiff's and Class Members' Personal Information has also diminished the value of that information.

280.    In the alternative to those claims seeking remedies at law, Plaintiff and Class Members allege that there is no plain, adequate, and complete remedy that exists at law to address Blue Shield's unlawful and unfair business practices.

281.    Further, no private legal remedy exists under HIPAA. Therefore, Plaintiff and Class Members are entitled to equitable relief to restore Plaintiffs and Class Members to the position they would have been in had Blue Shield not engaged in unfair competition, including an order enjoining Blue Shield's wrongful conduct, restitution, and disgorgement of all profits paid to Blue Shield as a result of its unlawful and unfair practices.

## COUNT XI
## Invasion of Privacy Under the California Constitution
### (On behalf of Plaintiff and the California Class)

282.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

283.    Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their Personal Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites for the provision of insurance and health care without being subjected to the tracking of their Personal Information without their knowledge or consent.

284.    By using Google Analytics and accompanying Tracking Tools to communicate patients' Personal Information, Blue Shield intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

285.    Plaintiff and Class Members had a reasonable expectation that their communications, identity, health information and other data would remain confidential, and that Blue Shield would not

- 46 -

**CLASS ACTION COMPLAINT**

utilize software or source code that would track their communications and/or Personal Information.

286.     Plaintiff and Class Members did not authorize Blue Shield to transmit their Personal Information to third parties, nor did they consent to allowing third parties to intercept, receive, and view those communications.

287.     This invasion of privacy is serious in nature, scope, and impact because it relates to patients' private medical communications. Moreover, it constitutes an egregious breach of the societal norms underlying the right of privacy.

288.     As a result of Blue Shield's actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

289.     Plaintiff and Class Members have been damaged as a direct and proximate result of Blue Shield's invasion of their privacy and are entitled to just compensation, including monetary damages.

290.     Plaintiff and Class Members seek appropriate relief for this injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests.

291.     Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Blue Shield's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights.

292.     Such damages are needed to deter Blue Shield from engaging in such conduct in the future.

293.     Plaintiff also seeks such other relief as the Court may deem just and proper.

## **PRAYER FOR RELIEF**

Plaintiff, on behalf of himself and the proposed Classes, respectfully requests that the Court grant the following relief:

(a)     Certification of this action as a class action and appointment of Plaintiff and Plaintiff's counsel to represent the Class(es);

(b)     A declaratory judgment that Defendant violated: (1) the California Confidentiality of Medical Information Act, Cal. Civ. Code §§ 56, *et seq*.; (2) the California Consumer Privacy Act, Cal. Civ. Code § 1798.100 *et seq*.; (3) the California Invasion of Privacy Act, Cal. Penal

Code § 631, *et seq*.; (4) California's Unfair Competition Law; and (5) Plaintiff's and Class Members' other rights under common law;

      (c)    actual and statutory damages, punitive damages, and monetary damages to the maximum extent allowable;

      (d)    injunctive relief as permitted by law or equity to assure that Class Members have an effective remedy, including enjoining Blue Shield from continuing the unlawful practices as set forth above;

      (e)    pre-judgment and post-judgment interest to the maximum extent allowable by law;

      (f)    reasonable attorneys' fees, costs, and expenses, as allowable by law; and

      (g)    Such other and further relief as the Court may deem appropriate.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, on behalf of himself and the proposed Class, demands a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: April 11, 2025          Respectfully submitted,

By:    */s/ Tina Wolfson*
Tina Wolfson (SBN 174806)
*twolfson@ahdootwolfson.com*
Theodore W. Maya (SBN 223242)
*tmaya@ahdootwolfson.com*
Alyssa Brown (SBN 301313)
abrown@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111

Jonathan S. Mann (*pro hac vice* forthcoming)
**PITTMAN, DUTTON, HELLUMS, BRADLEY & MANN, P.C.**
2001 Park Place North, Suite 1100
Birmingham, AL 35203
Tel: (205) 322-8880
Fax: (205) 328-2711
E: jonm@pittmandutton.com

*Attorneys for Plaintiff and the Putative Class*

**CLASS ACTION COMPLAINT**